Please the court. I'm Doug Olson. I am an assistant with the Federal Defender's Office here in Minnesota and I represented Mr. Childers in the case below and I represent him here on appeal. This case raises a Fourth Amendment question concerning the scope and manner of the claim of a Fourth Amendment violation concerning Mr. Childers. This case starts and kind of starts, the starting point of the analysis is that this really constitutes a question concerning the scope. Counsel, would you hold just a moment? Federal clerk, would you start our clock? Oh, gosh, that's okay. Well, if I could probably use a little bit more time anyway. Maybe we can see how this goes. Thank you. The issue has to do with the scope and manner of conducting a Terry stop. And just as a background, you know, the Terry stops originally were permitted with the idea that police officers are permitted a brief investigative stop, that's the word language, least intrusive manner in order to make an inquiry of a citizen who is a suspect of some crime or whatnot. And it's advanced from there into today's world where all kinds of situations arise. But once again, we have a question and usually just like the Fourth Amendment comes down to a question of reasonableness and under the situation here, the officer's response to the situation was unreasonable, resulting in an immediate escalation of a arrest and not a Terry stop. But what was unreasonable? I mean, they'd gotten an emergency call about shots fired. They show up. They had some preliminary description of the persons involved, three persons matching that description. And here's the situation and the case law is clear is that you have to look at the underlying situation, the nature of the offense being called in and what's going on. This situation, there was a report of shots being fired down at the river. It's 8 o'clock in the morning. I think it's a Saturday morning. There's nobody around. We're in a remote regional park and it's an isolated area. There's a report. Which means there wouldn't have been a lot of people around. What's that? Which means there wouldn't have been many people around to pick from. As the officer said, there wasn't anybody around. The only person that she ended up seeing was the three people. So there weren't people around. Their target, you know, at best, their target practicing into the river, the shooting into the river. The person who calls in doesn't even see a gun, just calls it in. All right, some people shooting into the river. Okay, that's, you know, they call it in. That was all. It wasn't... Didn't they say in a park, you keep saying in the river, and I know the river's parched by the river. But didn't the 9-11 call say the park? They're shooting weapons in the park. I don't think so. I think the officers knew immediately they were shooting into the river. I don't have that in front of me. But they knew they were shooting down by the river. Perceived. And the officers confirmed that, that when you're down by the river, this isn't in the park. She actually said that it wasn't in the park. The park area is different than the rest of it. It's very isolated. So they're responding to the shots fired, somebody's shooting a gun, a general description of the guys. No one's saying they're shooting at people. No one's saying that anyone's in danger. They just call it in. The officers respond, and this is where it gets into the arrest mode. The officers respond pursuant to their department policy. They conduct what they call a felony stop. Numerous officers respond, and all the officers see is three people matching the general description of what was called in. The officer that called it in and said stop these people is 100, you know, 200 feet away. To stop the general description, no one can see that they're armed, and the ruckus is over with, all right? This isn't an armed robbery or some crime in progress. The ruckus is over with. No one's shooting any guns down here. No one's in danger. There's nobody around. They're coming up to the vehicle. So she calls it in, and they conduct this felony stop. This is where it transforms immediately into an unreasonable arrest and not a stop. Was it lawful to discharge firearms at that location? No. It was either a misdemeanor, there's a misdemeanor, there's an argument about whether that constitutes reckless discharge. If I represented that case, I'd take it to trial and probably win because just shooting a gun into a river doesn't constitute reckless discharge under Minnesota law because of the high standard of recklessness doesn't just mean you're just doing something that, you know, upsets somebody. You've got to be reckless. So shooting in a river is the right place you should shoot something, but you can't do it under Burnsville municipal ordinance. The officers swoop in. Multiple cars come in. They've got their cherries going on. They block them in. Guns drawn. Get out of the car. They get Mr. Childers, who is on the edge of the car or in the driver's seat. He's got to get up. He's got to put his hands up here. He's got to show that he doesn't have a gun. He's got to take his hand. He's got to show it. He's got to go around in a circle for the officers, multiple officers with guns drawn. Get out here into the middle of the pavement. Get on the pavement, hands behind your back, and then they cuff him behind the back and then they drag him away for interrogation. It's all on a videotape and all in response to, you know, shooting a gun down by the river. The crime, this offense is over and done with, all right? There's no evidence that these people were, quote-unquote, armed and dangerous. He showed them he didn't have a gun, and they don't know anything about these people that would suggest that they're, quote-unquote, armed and dangerous. So this isn't the robbery situation, robbery in progress. It's not a burglary. It's not one of these situations in a high crime area where there's bad things going on all the time. This is a regional park, and it's quiet, and nothing else is going on except this previous shooting incident. By the time they got on the scene, this overreaction to the situation, and when you look at the case... You think the officers had no justification to do a pat-down? A pat-down, perhaps, and he showed that he didn't have a gun. They said, guns drawn. Maybe come up and have a pat-down, but what they did is they put him on the pavement, hands behind your back, handcuffed him, and then dragged him away. They did that to all three folks. Dragged him away, handcuffed, behind your back for interrogation. That's an arrest, right? And that's an... And the officer's action under these circumstances transformed what otherwise may have occurred. Address our recent Johnson case, which has a whole bunch of cases in it. Well, the Johnson case suggests an analysis governing these kinds of more intense situations where officers come upon a suspect, and they have to handcuff them, drag them away. And because your time's short, you know we have words like, our precedent permits using methods of force without automatically transforming a Terry Stockman to an arrest. That's a quote. Yeah. And that... So what do you do with the quotes like that in all the cases that are cited? Well, you know, and what you have to do is you have to go back, and you have to go back and look at the situation that I've described here, and look at the totality of the circumstances and apply the question of reasonableness. And that's why, you know, we've got a lot of cases out there where people are cuffed and taken out of cars, and there's a situation there. And if you look at those situations, the situations aren't somebody target practicing down by the Minnesota River in a remote regional park. You've got people in high crimes areas that are up to no good, and we have to respond differently. Each response, and the cases all say this, there's no per se rules here. Each case has to be looked at independently on the totality of the circumstances to determine if the officers are reasonable or not. The officers' actions here were, there was more force than necessary, and Terry says the least amount of force. Terry permits a reasonable response, you've got to investigate, but you don't have to drag people out of the car, you don't have to handcuff them, get them on the pavement, and then drag them away for interrogation. You would view this case different if the bullets were discovered before they were, at what point were the bullets discovered in this process? After he was effectively arrested, so he's already dragged off the scene. If the bullets had been found upon coming up to the individuals for an initial pat down, if they'd found the bullets at that point, would this be a different case in your opinion? It may have led to a different situation, yes. In this case, the pat down, at this point in time, this is, you know, he's already handcuffed, dragged over to the squad car, this is no, you know, they want to call it a Terry search, but they've already arrested him, and he's doing a, he's searching into his pockets, he actually got into all his pockets, dragged everything out. He's looking for evidence at that point in time. If there was a pat down and they discovered bullets earlier, the bullets themselves aren't per se illegal, they're not contraband, they had no idea they were dealing with somebody that just happened to have a felony record. So if the bullets were discovered earlier, I'm not sure that it would have necessarily changed anything. And I'm going to, I'm out of time, so I'm going to sit down. Thank you, Mr. Olson. Yeah. Good morning. May it please the Court, I'm Assistant United States Attorney Ruth Snyder, I worked on the defense on this appeal. This Court should affirm the denial of the defendant's motion to suppress, because all of the officer's actions here were supported by reasonable suspicion that the defendant and his companions were armed and dangerous, and the officer's actions were reasonable precautionary measures to preserve the safety and status quo of the scene while the officers figured out what was going on. So the de facto arrest issue is the central issue raised by the defense on this appeal, but I think some agreements are important to note at the outset here. The defendant is not contesting, as I have heard, that their officers had reasonable suspicion to stop him, that officers had reasonable suspicion to connect him to this shooting incident that somebody had just called 911 about, and in the brief they have conceded that they had reasonable suspicion to believe he was armed in some fashion. So the narrow question presented is whether, given those suspicions, what the officers did here was reasonable. Now as Judge Benton noted, this Court has cited in the Johnson case and others a number of factors that the Court will look at when determining whether something is a de facto arrest. I think the two most determinative ones here are the nature of the crime and the possibility that the suspects were armed, and the need for immediate action and the lack of less intrusive alternatives. So the relevant facts that were found by the District Court are as follows. This started with a shots fired call to 911. A civilian called 911. He reported a group of three males was on the shores of the river. It's called the Riverfront Park. It's a park, but there's a river. We're firing off a gun into the river. The caller was in a group of five. There were fishermen down there. This was not an area where there were no other people and there was no risk to anyone else. The caller described the suspects. He could hear the gunshots. He said, I think it's a 9mm or a .45. He was obviously alarmed enough to call police about this. It is a felony crime in Minnesota to recklessly discharge a firearm within city limits. So officers from Burnsville Police Department responded within minutes of the incident. There was not a long passage of time. This was within minutes officers were there. They saw the defendant and his two companions who matched the description, and they were starting to depart in a vehicle. The traffic stop took place in a public parking lot. There's other cars there. There's other people using the park. So in these circumstances, the district court found the officers had reason to believe they were approaching three people who were armed and dangerous, and they had the authority to take protective measures to preserve safety. The officers pulled in. They had their weapons out. They gave commands. They ordered people out one at a time. They patted them down, and they were ultimately secured in squad cars, although the evidence had been found at that point. So I think the putting into squad cars was kind of besides the point. These were reasonable measures to preserve safety and status quo. And — But putting them in the — doesn't that create more of an impression of arrest? I mean, these people obviously aren't free to go. Well, Your Honor, a notary stop is — are people free to go. And I think that what this court has recognized in Johnson and the many authorities cited, that when we're dealing with a situation where somebody — you know, they have reasonable suspicion there's a gun. And what's important here is that they have reasonable suspicion that the gun was just involved in an offense, an unlawful discharge of a firearm. That if we want police officers who see suspects that look like the reported suspects to be able to act in those situation, they have to do so in a way that ensures the safety of the scene. And that's necessarily going to come — Does the record have a listing of the time involved in the detention? It does, Your Honor. There — the dispatch notes were submitted and the R&R, the magistrate judge, specifically found it was about 10 minutes, start to finish, from when the cops pulled in to when the guns were found. So the bullets were found in the pocket even shorter than that. So as Your Honor is properly picking up on, this court, the Supreme Court, have appropriately been vigilant about lengthy detentions on less than probable cause. That is simply not what we have here. This — the various aspects of the stop were unfolding largely contemporaneously, and officers were able to confirm their suspicions within minutes. So the restraints on liberty were just not for a lengthy period of time. What the court emphasized below, as I mentioned, that there was a gun, there were three suspects, and that they were in the process of leaving. Officers couldn't see into the car, they couldn't see what the suspects might be doing with the guns that officers had reasonable suspicion to believe were there. Other members of the public were in the area, and what the magistrate judge noted is, she said, you can't predict how people are going to react in these circumstances. With the benefit of hindsight, it's easy to say, well, this was just goofing off, firing guns into the river, but the officers had no way of knowing how these three individuals who had guns were going to react when they were pulled over by police. And that makes the measures taken here, even in combination with each other, reasonable. Moving on from that to the — the pat frisk, Your Honor, Your Honors. Again, I don't hear a dispute that there was reasonable suspicion to conduct a Terry frisk. And the facts as found by the district court are crystal clear. The officer testified he was patting him down, he felt the outside of the pocket. Based on his training and experience, he could immediately feel what he recognized were bullets. And so there's two independent rationales that would permit him to then go in the pocket and seize those bullets. The first is based on the safety concerns outlined by the 11th Circuit in the en banc Johnson decision, the basic principle being, if we have an active scene, there's a gun that we haven't found yet, we can't let people keep bullets in their pockets. And so it is justified within the Terry rationale about danger and safety. But the Plainfield Doctrine is even more straightforward here. And I would point the Court to the Ward decision from, I guess it was about 30 years ago now, where almost identical facts. Officers had reasonable suspicion to believe that the suspect was about to be involved in a robbery, patted him down, felt shotgun shells. This Court had no problem saying, Plainfield Doctrine under Dickerson. The officer was permitted to seize them. And finally, the vehicle search, I'll just say briefly, once we get to the vehicle search, I think there's any number of doctrines that would support it. Protective suite, this was really a textbook protective suite. People had just been pulled out of the car, it was unclear who was going to be arrested, what was going to happen. The officer looks around the driver's seat, immediately sees a gun. But at this point, it could also be a probable cause search based on the bullets found in Arizona began. There was reason to believe that evidence of the crime of the arrest was in the car. So unless the Court has any questions, I will cede the rest of my time. Thank you. Thank you, Ms. Schneider. Well, I would note a couple of things that are important here, is that there was no question there was not probable cause to arrest Mr. Childers, there's no question about that. The Magistrate found that, the government didn't, and that's the record. In looking at the underlying offense, it's always important, and Johnson, in all the cases, it's important to know what the underlying offense is. In this case, it starts out as, at worst, it's a misdemeanor, a Burnsville City Ordinance violation to shoot a gun into the river. So there's got to be a lot more investigation done to raise this up to the level of a felony before this becomes a felony. That's what they're there. They're there and investigating, and instead of just investigating calmly, they ratcheted it right up and they arrested these people, including Mr. Childers, handcuffed him, put him on the pavement, and dragged him off for interrogation. That's an arrest, not a jury stop. Thank you. Thank you, Mr. Olson.